IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

COMMONWEALTH OF PUERTO RICO,

Plaintiff,

v.

JARED HEWITT,

Defendant.

CRIM NO.: 09-271 (PG)

## REPORT AND RECOMMENDATION

## I.     PROCEDURAL BACKGROUND

On August 7, 2009, the Commonwealth of Puerto Rico ("Commonwealth") commenced an

action in the Court of First Instance, San Juan Part, against defendant Jared Hewitt ("Hewitt"), a

Special Agent ("SA") with the Federal Bureau of Investigation ("FBI").  The Commonwealth

charged Hewitt with negligent homicide in violation of Article 109 of the Penal Code of Puerto Rico,

alleging that he negligently shot and killed Orlando González Ortiz ("González Ortiz"), a Puerto

Rico Police Officer, while both participated in a joint operation between the FBI and the Police of

Puerto Rico ("POPR") a year earlier, on August 7, 2008. (Docket No. 1-2.)

On August 17, 2009, Hewitt filed a timely Notice of Removal to this court pursuant to the

Federal Officers Removal Statute, 28 U.S.C. § 1442(a)(1). (Docket No. 1.)  The Commonwealth

opposed removal at oral argument on August 26, 2009. (Docket No. 6.)  By Memorandum and Order

dated September 3, 2009, the court granted Hewitt's petition for removal.[1] (Docket No. 7.)

---

[1] Accordingly, the criminal prosecution remains in federal court, applying federal procedural law but state substantive law. See Kentucky v. Long, 837 F.2d 727, 746 n.7 (6th Cir. 1988); Arizona v. Manypenny, 451 U.S. 232, 241 (1981), reh'g denied, 452 U.S. 955 (1981) (citing Tennessee v. Davis, 100 U.S. 257, 271-72 (1880)).

1

Pending before the court is Hewitt's motion to dismiss the charge against him pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, asserting immunity from prosecution under the Supremacy Clause of the United States Constitution. (Docket No. 28.)  The United States submitted a memorandum in support of Hewitt's motion, the Commonwealth opposed Hewitt's motion, and Hewitt and the United States each filed a reply to the Commonwealth's opposition. (Docket Nos. 29, 37, 39, 40.)

## II.    FACTS[2]

Since 2005, Hewitt has been a Special Agent with the FBI, a law enforcement agency within the United States Department of Justice.  In that year, Hewitt was assigned to the San Juan, Puerto Rico field office.  He has been a member of the San Juan field office Special Weapons and Tactics ("SWAT") team since 2007. (Docket No. 28 at 2, 4 ¶ 6; Docket No. 28-11 at 1.)

On August 4, 2008, kidnappers telephoned José Antonio Sánchez Polanco ("Sánchez") at his residence in Brownsville, Texas and requested a $650,000 ransom in exchange for the release of Sánchez's stepfather, Luis Felipe Bello Javier ("Bello Javier"), who had been kidnapped at gunpoint some days earlier in Puerto Rico. (Docket No. 28, ¶¶ 7, 9; Docket No. 28-2 at 1-2; Docket No. 37-1 at 1, 4, 5.)  Sánchez reported the kidnapping to the FBI's San Juan Division, which began investigating the kidnapping in conjunction with the FBI's Brownsville division.  In telephone calls

---

[2] Unless otherwise indicated, the facts set out here are undisputed. In its recitation of the factual background, the Commonwealth relies exclusively on an investigative report prepared by the Puerto Rico Department of Justice (PRDOJ), Operation Laguna Gardens: Special Investigation, August 7, 2008, Murder victim: Officer Orlando González-Ortiz. (Docket No. 37-1.)  Hewitt's recitation of the facts also cites that report, as well as an investigative report prepared by the FBI, Shooting Inquiry, Report of Shooting Incident, San Juan Division 08/07/2008, supplemented by Hewitt's own declaration. (Docket No. 28-2; Docket No. 28-3; Docket No. 28-11.) Hewitt also submits, but does not cite, sworn statements of various FBI and POPR personnel, which are referenced herein only insofar as the court consulted them for clarification of the facts as set out in the investigative reports from the FBI and PRDOJ. (Docket No. 28-6 at 116-17, 101; Docket No. 28-7 at 28-29; Docket No. 28-8 at 16, 31; Docket No. 28-10 at 2, 5, 22, 33-35.)

recorded by the FBI between Sánchez and the kidnappers, the kidnappers threatened to kill Bello Javier if the police were contacted or the ransom was not paid. (Docket No. 28, ¶ 8; Docket No. 28-2 at 2; Docket No. 37-1 at 4-5.)  On August 5 and 6, 2008, the San Juan FBI, POPR Task Force Officers, and POPR Bank Robbery Unit ("BRU") officers executed several search warrants, which failed to discover Bello Javier.  Also on August 6, Sánchez traveled to Puerto Rico to cooperate in the investigation, and the requested ransom was lowered to $50,000. (Docket No. 28, ¶¶ 10-11; Docket No. 28-2 at 2-3; Docket No. 37-1 at 5-7.)

On the morning of August 7, 2008, the Special Agent in Charge ("SAC") of the San Juan FBI, Luis Fraticelli ("Fraticelli"), Assistant Special Agent in Charge ("ASAC") Luis Figueroa ("Figueroa"), and Supervisory Special Agent ("SSA") Louis Feliciano ("Feliciano") approved the use of $50,000 for use as show money, and the San Juan FBI SWAT team was activated to cooperate with the hostage rescue. (Docket No. 28, ¶ 12; Docket No. 28-2 at 3; Docket No. 37 at 3; Docket No. 37-1 at 8-9.)  At about 2:00 p.m., FBI personnel attended a meeting at the General Services Administration ("GSA") offices to discuss the hostage rescue.[3]  SAC Fraticelli stressed the importance of every member of the operation knowing every other member so as to prevent any member's death by friendly fire. (Docket No. 28, ¶ 13; Docket No. 28-2 at 4; Docket No. 37 at 3; Docket No. 37-1 at 9-10.)  However, not all the personnel present at the meeting shared the same understanding regarding the participation of POPR BRU officers in the operation.  According to ASAC Figueroa and SSA Feliciano, the plan required the involvement of POPR BRU officers to assist in tracking the FBI show money if it was exchanged. (Docket No. 28, ¶ 14; Docket No. 28-2

---

[3]The evidence indicates that three SWAT members were at the GSA meeting, including the SWAT program ASAC, Samuel Santana, SWAT Senior Team Leader SA M.Q.R., and SWAT Advisor SSA Wilfredo Molina. (Docket No. 37-1 at 9.)  However, the parties have neither argued nor directed the court to evidence that either Hewitt or any POPR officer was present at the GSA meeting.

at 4; Docket No. 37 at 3; Docket No. 37-1 at 10-11.)  However, SWAT program ASAC Samuel

Santana remembered that the plan was for the SWAT team to arrest the subjects before the money

was even shown to them.  ASAC Santana thus did not expect the officers from POPR BRU to be

involved in any way in the operation. (Docket No. 28, ¶ 14; Docket No. 28-2 at 4; Docket No. 37

at 3; Docket No. 37-1 at 10-11.)  The show money was photocopied in part and equipped with a

POPR BRU transmitter. (Docket No. 28, ¶ 15; Docket No. 28-2 at 4; Docket No. 37 at 3; Docket No.

37-1 at 11.)

  As the GSA meeting was coming to an end, the SWAT team planned and rehearsed a hostage

rescue, which would be executed once Sánchez saw the victim.  Twelve SWAT members, each

assigned a specific duty, were divided into three Chevrolet Suburban vehicles ("SWAT 1", "SWAT

2", and "SWAT 3").  Hewitt was positioned in the center rear of SWAT 3, and his duty was to

provide rear security.  He remembers that the SWAT leadership alerted him that the kidnappers

("subjects") were armed and extremely dangerous and that there would likely be a 360 degree threat

with multiple subject vehicles.[4] (Docket No. 28, ¶¶ 16, 31; Docket No. 28-2 at 4-5; Docket No. 28-

11 at 2; Docket No. 37 at 3-4; Docket No. 37-1 at 11-12.)  At the conclusion of the SWAT meeting,

FBI surveillance group members and SWAT team members met in the GSA parking lot to facilitate

the identification of all involved personnel and vehicles.  No POPR BRU officers were present at

this meeting.  Photos and descriptions of Bello Javier and Sánchez were provided to surveillance

group personnel.  Most SWAT personnel saw the photos of Sánchez and/or Bello Javier, but not all

of them remember seeing photos and descriptions of both.  No written plan of the operation was ever

---

[4]Hewitt explains in his declaration that he "was reminded by the SWAT Assistant Team Leader that there
would likely be . . . multiple subject vehicles." (Docket No. 28-11 at 2.) Nevertheless, the FBI and PRDOJ reports
state that the SWAT team only rehearsed scenarios in which a single vehicle was approached from the rear. (Docket
No. 28-2 at 5; Docket No. 37-1 at 12.)

produced, and Hewitt recalls that he was never informed – during the operations brief, rehearsal, or operation itself – that any POPR units would assist with the arrest operation or be present in close proximity. (Docket No. 28, ¶¶ 17-18, 31; Docket No. 28-2 at 5; Docket No. 28-11 at 3, 5-6; Docket No. 37 at 4 & n. 3; Docket No. 37-1 at 13-14.)

Sánchez negotiated with the kidnappers so that they would show him Bello Javier alive at the parking lot of Laguna Gardens Shopping Center ("Laguna Gardens") in Carolina, Puerto Rico, and then Sánchez would follow the kidnappers to Bebo's Café, also in Carolina, where the ransom money would be exchanged.[5] (Docket No. 28, ¶ 21; Docket No. 28-2 at 7; Docket No. 37 at 6; Docket No. 37-1 at 17-18.)  Between 8:00 p.m. and 9:00 p.m., the personnel involved in the operation began arriving at Laguna Gardens.  After some repositioning, the vehicle driven by Sánchez and the hostage negotiators' vehicle were stationed in the Laguna Gardens parking lot, other surveillance group vehicles were positioned just outside the parking lot or close by, and the three-car SWAT convoy was parked in a nearby municipal police station.[6] (Docket No. 28, ¶ 22; Docket No. 28-2 at 7-8; Docket No. 37 at 7; Docket No. 37-1 at 19-21.)  Later, a vehicle occupied by SSA Feliciano and FBI Task Force Agents ("TFA"s) Angel Reyes López ("Reyes") and Francisco Candelaria ("Candelaria") joined the SWAT convoy at the police station. (Docket No. 28, ¶ 23; Docket No. 28-2 at 8; Docket No. 37 at 8; Docket No. 37-1 at 21-22.)  SWAT agreed that this vehicle would follow the SWAT convoy and provide rear security. (Docket No. 28, ¶ 23; Docket No.

---

[5]The parking lot of a Pueblo Xtra strip shopping center in Carolina was initially selected as the location for the hostage exchange, and FBI surveilled the area with notable results, but the kidnappers then contacted Sánchez to arrange for the exchange to take place elsewhere. (Docket No. 28, ¶¶ 19-20; Docket No. 28-2 at 6; Docket No. 37-1 at 15-16.)

[6]The undercover negotiators' vehicle parked in a position to see Sánchez's vehicle, but the parties do not point to any evidence that the negotiators personally interacted with the kidnappers.  Sánchez remained the kidnappers' point of contact. (Docket No. 28-2 at 7; Docket No. 37-1 at 19-20.)

28-2 at 9; Docket No. 37 at 8; Docket No. 37-1 at 22.)

Subsequently, a green Hyundai parked in the vicinity of the police station. SSA Feliciano identified its occupants as two POPR BRU officers. (Docket No. 28, ¶ 23; Docket No. 28-2 at 9; Docket No. 37 at 8-9; Docket No. 37-1 at 22.) The POPR BRU officers, González Ortiz and Carlos González Sotomayor ("González Sotomayor"), had been relocated to the periphery of Laguna Gardens per the request of an FBI TFA. The mission of the POPR BRU agents was limited to following the show money if it was taken from the FBI's internal perimeter. Nevertheless, TFA Reyes provided them with an FBI radio to supplement FBI surveillance, though they were told not to speak on it.[7] (Docket No. 28, ¶¶ 24-25; Docket No. 28-2 at 9; Docket No. 37 at 9; Docket No. 37-1 at 22-23.)

At around 11:40 p.m., the kidnappers arrived at the Laguna Gardens parking lot. They were in two vehicles, a blue Toyota Corolla and a silver Chevrolet Lumina. The lead hostage negotiator, Supervisory Senior Resident Agent Felix Rivera ("Rivera"), observed a suspect exit the Lumina and walk to its trunk. Sánchez also walked to the trunk of the Lumina, now open, and Rivera heard Sánchez say "I already saw him." Rivera relayed the message "the victim is here" over a radio channel. (Docket No. 28, ¶ 26; Docket No. 28-2 at 9; Docket No. 28-8 at 16; Docket No. 37 at 10; Docket No. 37-1 at 9, 23-24.) Rivera then observed an individual appear from the trunk of the Lumina, whom Rivera believed was Bello Javier, and Rivera heard a surveillance group member say, "the victim is out of the trunk." The suspect who had exited the Lumina returned to its driver's seat,

---

[7]The FBI and PRDOJ reports both state that TFA Reyes provided a FBI radio to the two POPR BRU officers and that SSA Feliciano then advised SWAT of this transaction over the radio. (Docket No. 28-2 at 9, 12; Docket No. 37 at 9; Docket No. 37-1 at 32.) However, the parties have pointed to no evidence confirming that Hewitt or other SWAT team members actually heard such notification over the radio. At the time of the operation, several communication channels were being used by the various personnel involved, including radio, cellular phones and Blackberries. (Docket No. 37 at 7, Docket No. 37-1 at 20.)

and both the Corolla and the Lumina began departing the parking lot at high speed.[8]  Rivera gave the "go" signal. (Docket No. 28, ¶ 26; Docket No. 28-2 at 10; Docket No. 28-8 at 16; Docket No. 37 at 10-11; Docket No. 37-1 at 24-25.)  Task Force vehicles positioned near the parking lot moved to block the exits.  As the Corolla attempted to exit the parking lot, it crashed into a Task Force vehicle and aggressively pushed it towards the curb, prompting one of the agents inside to fire at the Corolla. The Lumina, however, managed to leave the parking area and sped southbound on Laguna Avenue. An agent fired at the Lumina, fearing the vehicle would strike oncoming traffic. (Docket No. 28, ¶ 27; Docket No. 28-2 at 10; Docket No. 37 at 11; Docket No. 37-1 at 25-26.)

The SWAT convoy, delayed by difficulties in obtaining identification information about the subject vehicles, was traveling north on Laguna Avenue and arrived at the parking lot entrance just as the Lumina exited. (Docket No. 28, ¶ 28; Docket No. 28-2 at 10; Docket No. 37 at 12; Docket No. 37-1 at 27; see Docket No. 28, ¶ 31; Docket No. 28-11 at 4.)  SWAT 1 was followed, in order, by SWAT 2, SWAT 3, the Suburban vehicle carrying SSA Feliciano and TFAs Reyes and Candelaria, and the green Hyundai occupied by the two POPR BRU officers.[9] (Docket No. 28, ¶¶ 28, 29; Docket No. 28-2 at 10; Docket No. 37 at 12; Docket No. 37-1 at 27.)  As those vehicles stopped in a column on Laguna Avenue, the Lumina sped by in the opposite direction.  SWAT members in SWAT 1 and SWAT 2 focused their attention ahead on the Corolla, and they also perceived a threat on the

---

[8]FBI Task Force Officer Juan De Jesus Rodríguez ("De Jesus Rodríguez") states in a declaration that he observed the hostage exchange from a vehicle in the Laguna Gardens parking lot, heard a suspect ask Sánchez where the money was, and heard Sánchez say "the money was in the vehicle."  Then, De Jesus Rodríguez recalls, one of the suspects opened the passenger side door of Sánchez's vehicle and took the money bag out of the vehicle. (Docket No. 28-8 at 31.)

[9]According to TFA Reyes, SSA Feliciano announced over the radio that the POPR BRU officers were following the SWAT convoy. (Docket No. 28, ¶ 35; Docket No. 28-2 at 12; Docket No. 37 at 16; Docket No. 37-1 at 32.)  However, the occupants of SWAT 1, SWAT 2, and SWAT 3 were unaware that the Hyundai was following the SWAT convoy. (Docket No. 28, ¶ 28; Docket No. 28-2 at 10; Docket No. 37 at 12; Docket No. 37-1 at 27.)

vehicle's east side in the form of a sedan with tinted windows.  The driver of the sedan then identified himself as ASAC Santana.  (Docket No. 28, ¶ 29; Docket No. 28-2 at 11; Docket No. 37 at 12-14; Docket No. 37-1 at 27-29.)

There are divergent eyewitness accounts of the events that followed the moment when the SWAT convoy stopped at the scene of the arrest operation.  The parties do not dispute that Hewitt exited SWAT 3, observed González Ortiz in a field to the east of the convoy, and fired shots that killed him.  However, because Hewitt's perception of González Ortiz as a threat at the time of the shooting forms the crux of the court's present inquiry, the contemporaneous eyewitness accounts are recounted herein.

*Special Agent Hewitt*

After hearing a gunshot behind his vehicle and possibly a collision, Hewitt exited SWAT 3 and focused his attention on the area to the rear of the SWAT convoy.  In the dark, he saw González Ortiz, unknown to Hewitt at the time, wearing dark clothing, carrying a handgun, and running in Hewitt's direction, parallel to the perimeter.[10]  Hewitt gave numerous verbal commands to González Ortiz to stop, but González Ortiz did not comply.  When González Ortiz abruptly turned towards him, Hewitt began to shoot at González Ortiz.  González Ortiz stumbled, and when Hewitt saw him begin to raise his body up again, Hewitt fired several more rounds.  Only after firing these rounds was the area illuminated – either by a flash-bang or another form of light – such that Hewitt saw the word "POLICIA" (that is, "POLICE", in Spanish) written on González Ortiz's back as he lay on the

---

[10] Hewitt's declaration specifies neither the compass direction in which González Ortiz was running at the time of the shooting nor the precise location of González Ortiz relative to Hewitt himself.  Hewitt's declaration states that after focusing his attention on the area to the rear of the SWAT convoy, he observed that González Ortiz was running "in my direction . . . parallel to the perimeter" and that he was "aggressively approaching myself and other SWAT operators." (Docket No. 28-11 at 4, 5.)  Hewitt also notes that "[t]he field was very dark," but he does not explicitly articulate whether or not González Ortiz was in said field.  (Docket No. 28-11 at 5.)

ground.[11] (Docket No. 28, ¶ 31; Docket No. 28-11 at 4-5.)

*Special Agent Quilinchini*

SA Norman Alberto Quilinchini ("Quilinchini") exited SWAT 3, and, along with Hewitt, moved to a position on the right (east) side of the vehicle. Conducting reconnaissance to the south, Quilinchini perceived the Lumina speed by the SWAT column and noticed that two vehicles, which he did not recognize, were parked behind SWAT 3 with their headlights on. Hearing gunshots over his left shoulder, Quilinchini turned to observe Hewitt, five to six feet northeast of him, shoot his gun into the dark field to the east. There, at a distance of approximately 45 feet and down a low slope, Quilinchini observed González Ortiz, unknown to Quilinchini at the time, wearing a dark top and jeans, his hands near his waistline, walking towards Hewitt and other SWAT agents. Relying on Hewitt's perception of González Ortiz as a threat, Quilinchini shouted "FBI, don't move," and shot towards González Ortiz, who was in the process of kneeling. Quilinchini fired another shot while González Ortiz was on his knees, and then González Ortiz fell to the ground, face down. Quilinchini did not hear any commands from Hewitt prior to firing the shots. Almost simultaneously to firing the shots, which did not strike González Ortiz, Quilinchini observed a flash-bang four or five feet inside the field. (Docket No. 28, ¶ 30; Docket No. 28-2 at 11-12, 16; Docket No. 28-6 at

---

[11] The facts in this paragraph are related in Hewitt's motion, citing to Hewitt's declaration. The Commonwealth does not dispute that these were Hewitt's observations. (Docket No. 28, ¶ 31; Docket No. 37.) The Commonwealth does raise an issue as to Hewitt's observation in his declaration that González Ortiz "appeared to fall after being tackled", soon after Hewitt noticed him running. (Docket No. 37 at 23; see Docket No. 28, ¶ 31; Docket No. 28-11 at 4.) The Commonwealth correctly notes that González Ortiz's location when he appeared to fall is not clear from Hewitt's declaration. The fact that Hewitt viewed González Ortiz appear to fall is only relevant if such observation could affect Hewitt's perception of González Ortiz as a threat. The Commonwealth suggests Hewitt may have observed González Ortiz appear to fall in a place where there "was adequate lighting," such that he would have been identifiable as a POPR officer and therefore presented less of a threat. However, even assuming that González Ortiz was adequately lit at the scene of the operation at some point prior to the fatal shooting, whether or not Hewitt viewed González Ortiz at that point is pure conjecture. No party has argued that the fact that Hewitt saw González Ortiz appear to fall is relevant for any other reason. Accordingly, the fact has not been considered.

101; Docket No. 37 at 14-15, 24; Docket No. 37-1 at 30-31, 40.)

*Special Agent DeLong*

SA DeLong, who had exited SWAT 3 through the right rear door, moved towards shots he had heard in front of the vehicle and to the left.  Seconds later, he heard explosions from behind him, and he observed two SWAT agents standing on the east side of the road, pointing their weapons in the same direction and giving commands, including, in Spanish, "show me your hands."  DeLong moved to the right of the agents.  Thirty feet away, at the bottom of a descent, DeLong viewed the silhouette of González Ortiz lying on the ground.  Unaware that the prone individual was González Ortiz, DeLong threw a flash-bang near González Ortiz to initiate compliance with the agents' orders.  With the illumination of the flash-bang, DeLong was able to see white lettering on González Ortiz's back, identifying González Ortiz as a police officer.  After hearing another POPR officer yell "he is a team member," DeLong ran to assist González Ortiz, heard someone shout "watch the gun in his hand," and took a gun from González Ortiz's hand. (Docket No. 28, ¶ 32; Docket No. 28-2 at 12; Docket No. 28-6 at 116-17; Docket No. 37 at 15-16; Docket No. 37-1 at 31-32.)

*Task Force Agent Candelaria*

When the Suburban vehicle carrying SSA Feliciano and TFAs Reyes and Candelaria stopped behind SWAT 3, Candelaria exited the driver's side and moved behind the vehicle.  Recognizing González Ortiz as a POPR BRU officer, Candelaria saw González Ortiz exit the driver's side of the Hyundai, parked ten feet behind Candelaria's vehicle, and begin running east towards a grassy area east of Laguna Avenue.  Candelaria wondered where González Ortiz was going and observed two SWAT team agents, approximately fifteen to twenty feet from González Ortiz.  While González Ortiz was running east, Candelaria began to shout "He is a team member! He is a policeman!"  He

10

also heard FBI agents shout in English.  González Ortiz proceeded to an area where, Candelaria

recalls, it was very dark.  Next, Candelaria observed a SWAT agent fire towards González Ortiz,

heard a flash-bang and several more rounds, and finally saw a SWAT agent approach González

Ortiz. (Docket No. 28, ¶¶ 34-35; Docket No. 28-2 at 12-13; Docket No. 28-7 at 28-29; Docket No.

37 at 16; Docket No. 37-1 at 32-33.)

*Police of Puerto Rico Officer González Sotomayor*

Officer González Sotomayor, the passenger in the green Hyundai driven by his partner,

González Ortiz, recalls that as they approached the Laguna Gardens parking lot, he heard gunshots

and multiple car crashes, and that he told González Ortiz to exit the Hyundai and take cover after

parking their vehicle.  Later, having observed González Ortiz standing in an exposed position,

González Sotomayor pulled González Ortiz down near the Hyundai, and he heard a SWAT team

member near right side of the last Suburban shout "get out of there, get out of there," and more

gunshots.  Later, González Sotomayor saw González Ortiz walking in the field northeast of him,

although he could not tell whether González Ortiz had his weapon in his hand.  Then he saw a

SWAT operator shoot five to six times at González Ortiz, noting that the operator and González

Ortiz were facing each other at the time of the shooting.  González Sotomayor shouted "don't shoot,

he's a police officer, he's a friend," and heard a different SWAT team member shout the same thing.

González Sotomayor recalls that González Ortiz tumbled, landing about ten feet from the SWAT

team member who was shooting at him, and that the SWAT team member then moved forward and

fired five to six more rounds at González Ortiz at a range of three to four feet.  From a distance of

18-20 feet, González Sotomayor remembers approaching the SWAT member, shouting "don't shoot,

he's a friendly." According to González Sotomayor, this prompted the SWAT member to point his

weapon at him.  At that point, González Sotomayor also felt a strong explosion from a flash-bang near González Ortiz's body, so González Sotomayor retreated for cover to his original position. Once González Sotomayor recovered, he identified himself to the SWAT team members, walked towards his wounded partner, and noticed that González Ortiz's stainless steel semiautomatic gun was under his right leg. (Docket No. 28, ¶¶ 36, 39-40; Docket No. 28-2 at 13-14; Docket No. 28-10 at 33-35; Docket No. 37 at 18-19; Docket No. 37-1 at 34-36.)

*Other evidence from the scene of the incident*

On the night of his death, González Ortiz was wearing a black pullover short sleeve shirt with blue jeans.  Over this shirt, he had a dark blue, size small-regular ballistic vest, which read "POLICIA" above the right breast and on the back.  The letters of "POLICIA" were not made of luminescent material. (Docket No. 28, ¶ 41; Docket No. 37-1 at 38, 43, 47, 54 n.7.)  That night, 39% of the moon's visible disk was illuminated, and there were two functioning streetlights in the vicinity of the shooting location, although SWAT personnel at the scene typically described the area as very dark, as did TFA Candelaria, TFA Reyes, and SSA Feliciano.  POPR BRU Supervisor José Rosa concurred, describing the lighting as poor, but González Sotomayor and other POPR officers described the lighting conditions as sufficient to observe the incident. (Docket No. 28, ¶ 42; Docket No. 28-2 at 15; Docket No. 28-10 at 2, 5, 22, 34; Docket No. 37 at 19; Docket No. 37-1 at 38-39.)

## III.    LEGAL ANALYSIS

### A. Standard of Review

Hewitt requests that the indictment be dismissed on the basis of Supremacy Clause immunity. Because the applicability of Supremacy Clause immunity is "capable of determination without a trial of the general issue," it is appropriately raised in a Rule 12(b) pretrial motion to dismiss. Fed. R.

Crim.P. 12 advisory committee's note to subdivision (b)(1) and (2); Kentucky v. Long, 837 F.2d 727, 750 (6th Cir. 1988) ("We therefore hold, as a general proposition, that a Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution.").  In response to Hewitt's threshold assertion of Supremacy Clause immunity, the Commonwealth bears the burden of presenting evidence to raise a genuine, material issue of fact concerning the validity of the defense.  See, e.g., Long, 837 F.2d at 752; New York v. Tanella, 374 F.3d 141, 148 (2d Cir. 2004); City of Jackson v. Jackson, 235 F. Supp. 2d 532, 534 (S.D. Miss. 2002).  The court, however, views the evidence in the light most favorable to the Commonwealth, as the non-moving party, and assumes the truth of the factual allegations in the criminal complaint. See New York v. Tanella, 281 F. Supp. 2d 606, 612 (E.D.N.Y. 2003), aff'd, 374 F.3d 141 (citing Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n. 16 (1952) ("This case is here to review the granting of a motion to dismiss the indictment. It should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true."); Morgan v. California, 743 F.2d 728, 733 (9th Cir. 1984) (stating that in granting a writ of habeas corpus on the basis of the Supremacy Clause, the court must "view[ ] the disputed evidence in the light most favorable to the state"); Clifton v. Cox, 549 F.2d 722, 728 (9th Cir. 1977) (assuming the truth of the state's evidence in determining whether the conduct of a federal officer was necessary and proper) (citation omitted)).

**B. Supremacy Clause Immunity**

The Supremacy Clause protects federal officers from state prosecution for acts committed within the reasonable scope of their duties. In re Neagle, 135 U.S. 1 (1890).  Courts undertake a two-part inquiry to determine whether a federal agent may be prosecuted for conduct which, on its face,

violates a state criminal code.  Supremacy Clause immunity applies where (1) the federal officer was

acting pursuant to the laws of the United States; and (2) in performing his duty, the officer did no

more than what was necessary and proper for him to do.  E.g., Long, 837 F.2d at 744 (citing Neagle,

135 U.S. at 75)).  It is uncontested that Hewitt was acting as an officer of the United States when he

shot González Ortiz. (Docket No. 28 at 28; Docket No. 37 at 22.)  Accordingly, the court must grant

Hewitt's motion to dismiss the indictment unless the evidence demonstrates that a genuine issue of

fact remains as to whether he did no more than what was necessary and proper for him to do in the

exercise of his office.  See, e.g., Wyoming v. Livingston, 443 F.3d 1211, 1220 (10th Cir. 2006);

Tanella, 374 F.3d at 147; Jackson, 235 F. Supp. 2d at 534-35.

In order to satisfy the "necessary and proper" component, courts typically require that two

conditions be satisfied: (1) the defendant's actions must be objectively reasonable and (2) the

defendant must subjectively believe that his actions were justified.  See, e.g., Tanella, 374 F.3d at

147 (citing Whitehead v. Senkowski, 943 F.2d 230, 234 (2d Cir. 1991)); Long, 837 F.2d at 745;

Clifton, 549 F.2d at 728.  However, the Tenth Circuit has recently questioned whether the subjective

inquiry is appropriately included in the "necessary and proper" analysis, and the First Circuit has not

explicitly articulated the elements of a Supremacy Clause immunity claim. Livingston, 443 F.3d at

1221-22 (noting that Supreme Court rejected subjective prong of analogous qualified immunity

defense in Harlow v. Fitzgerald, 457 U.S. 800, 815-19 (1982), and pointing out that subjective

element was not present in early Supreme Court decisions developing Supremacy Clause immunity

doctrine); see Puerto Rico v. Torres Chaparro, 738 F. Supp. 620, 622 (D.P.R. 1990) ("What is

necessary and proper is a subjective measurement guided by whether a defendant reasonably thinks

his conduct is necessary and justifiable." (citing Kentucky v. Long, 637 F. Supp. 1150 (W.D. Ky.

14

1986), aff'd, 837 F.2d 727)), aff'd per curium, 922 F.2d 59 (1st Cir. 1991).  Nevertheless, because both Hewitt and the Commonwealth urge this court to include the subjective element, and because the inclusion of the subjective element does not change the outcome, the instant analysis will adopt the approach taken by the majority of the circuits to have addressed the issue.  Tanella, 374 F.3d at 147; Clifton, 549 F.2d at 728; Long, 837 F.2d at 745; see also Idaho v. Horiuchi, 253 F.3d 359, 366 n. 11 (9th Cir. 2001) (en banc) (suggesting that subjective analysis may be inappropriate in light of Harlow v. Fitzgerald, 457 U.S. 800 (1982), but not deciding the issue "because it makes no difference on this appeal"), vacated as moot en banc, 266 F.3d 979 (9th Cir. 2001).  That is, defendant's actions are only "necessary and proper" if they are both objectively reasonable and subjectively justified.

The Commonwealth advances several arguments to demonstrate that Hewitt's actions were not objectively reasonable or subjectively justified.  First, the Commonwealth argues that Hewitt must have known González Ortiz was an allied officer, because "[a]t some point Hewitt must have seen" the POPR officers in the green Hyundai at the municipal police station and because González Ortiz and González Sotomayor took cover positions at the scene of the shooting based on the cover positions previously taken by the SWAT team members.  Second, the Commonwealth points out that González Ortiz may not have heard Hewitt's commands, and even if he did hear them, there is no evidence that Hewitt specifically told González Ortiz to "drop your weapon."  Third, the Commonwealth emphasizes that Hewitt was armed with a machine gun while González Ortiz carried only a handgun, and that Hewitt fired at González Ortiz before before González Ortiz pointed his handgun at Hewitt.  Finally, the Commonwealth claims that in any case, it would have been "extremely difficult" for Hewitt to see González Ortiz's handgun prior to the shooting, since

González Ortiz's handgun was found under his right leg, suggesting that González Ortiz was carrying his handgun in his right hand, on the far side of his body relative to Hewitt as González Ortiz ran through the field.  The Commonwealth takes as a given that Hewitt was positioned up a dark slope 30 to 45 feet west of González Ortiz.

### 1. Hewitt's Subjective Belief

In order to demonstrate that a genuine issue of material fact exists as to whether Hewitt subjectively believed his actions were justifiable, the Commonwealth must present evidence that Hewitt employed means which he could not "honestly consider reasonable in discharging his duties." Clifton, 549 F.2d at 728; see also In re McShane's Petition, 235 F. Supp 262, 273 (N.D. Miss. 1964) (federal officers not immune where they employ means which they cannot honestly consider reasonable or "otherwise act out of malice or with some criminal intent"); In re Lewis, 83 F. 159 (D.C. Wash. 1897) ("[W]here there is no criminal intent on his part he does not become liable to answer to the criminal process of a different government.").

Hewitt claims that he shot and killed González Ortiz because he believed González Ortiz posed a threat to himself and his fellow SWAT team members, and it was his duty to provide rear security to the team.  Hewitt perceived González Ortiz as a threat, he asserts, because González Ortiz was aggressively approaching him and other SWAT operators, had a gun in his hand, failed to follow numerous vocal commands, and turned his body towards Hewitt the moment before Hewitt fired. (Docket No. 25-11 at 5-6.)

None of the Commonwealth's arguments raise any question about Hewitt's state of mind when he shot González Ortiz.  First, assuming that Hewitt did in fact notice the green Hyundai in the municipal parking lot, the Commonwealth points to no evidence that Hewitt knew the individuals

in the Hyundai were part of the operation.  Assuming further that Hewitt recognized González Ortiz as a POPR officer when González Ortiz took a position near the Hyundai on Laguna Avenue, there is no evidence that Hewitt knew the individual in the field was González Ortiz, once he had left the position near the Hyundai.  At the time of the shooting, Hewitt shouted commands which he intended to be heard by González Ortiz, and González Ortiz, an individual carrying a gun whom Hewitt did not recognize, failed to comply.  Whether or not González Ortiz heard the commands is irrelevant to the subjective analysis so long as Hewitt intended for González Ortiz to hear them. Moreover, assuming that Hewitt did not explicitly command González Ortiz to drop his weapon, such omission does not in itself call into question Hewitt's intentions, especially since Hewitt's order that González Ortiz stop moving - orders which were echoed by Quilinchini - were not obeyed. Cf. Tanella, 374 F.3d at 150 (use of standard police warning "stop or I'll shoot" was insufficient to raise a genuine issue of fact about officer's motive in shooting suspect).  In short, taking the facts in the light most favorable to the Commonwealth, there is no basis for concluding that in shooting González Ortiz, Hewitt had any "'motive other than to do his job under circumstances as they appeared to him.'" Id. (quoting Long, 837 F.2d at 744).

### 2. The Reasonableness of Hewitt's Belief

To sustain Hewitt's invocation of Supremacy Clause immunity, the evidence need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." Clifton, 549 F.2d at 728.  Thus, although the court considers the facts in the light most favorable to the Commonwealth, those facts are objectively evaluated as they appeared to Hewitt at the time of the incident.  See Tanella, 374 F.3d at 147.  The Commonwealth's arguments boil down to two essential assertions: (1) it was unreasonable for Hewitt not to recognize that González Ortiz was an

17

allied officer; and (2) it was unreasonable for Hewitt to perceive that González Ortiz presented a threat that required the use of deadly force.

As to the first assertion, the Commonwealth's argument that Hewitt must have seen the POPR officers at the municipal police station and later recognized González Ortiz as a POPR officer at the scene of the incident is speculative.  The Commonwealth has not directed the court to any evidence that Hewitt or anyone else in SWAT 1, SWAT 2, or SWAT 3 ever received notification that the POPR BRU officers were participating in any aspect of the operation, nor has the Commonwealth shown that anyone in those vehicles recognized the POPR officers at the police station or at the scene of the shooting.[12]  Further, the Commonwealth recognizes that as the SWAT team approached the shopping center, it lacked information regarding the vehicle or vehicles to be taken over. (Docket No. 37 at 7.)  Therefore, it was reasonable for unrecognized vehicles or individuals in the vicinity to fall under suspicion.  Indeed, the lack of information was such that agents in SWAT 1 and SWAT 2 mistook a vehicle driven by FBI leadership, ASAC Santana, as a potential subject vehicle.

Moreover, even if Hewitt had been alerted that González Ortiz and González Sotomayor had parked the Hyundai at the end of the SWAT convoy, the Commonwealth has not shown that Hewitt unreasonably failed to recognize González Ortiz once he left the Hyundai and ran into the open field. The Commonwealth cites the observations of only one FBI agent, TFA Candelaria, who recognized González Ortiz as an allied officer as he ran into the field, and even Candelaria "wondered where

---

[12]The Commonwealth has shown that two radio announcements were made in an attempt to alert FBI personnel to the presence and participation of the POPR BRU officers: first upon the arrival of the POPR BRU officers at the municipal police station and later upon the SWAT convoy's approach to Laguna Gardens.  However, there is no evidence that Hewitt or anyone else in his vehicle, SWAT 3, heard those announcements.  The Commonwealth concedes that various modes of communication were being used at the time of the operation. (Docket No. 37 at 7.)

[González Ortiz] was going when he began running from the Hyundai to the green area east of Laguna Avenue." (Docket No. 37 at 16 (citing Docket No. 37-1 at 32-33).) Candelaria also noted that González Ortiz ran to an area where it was very dark. While González Sotomayor and other POPR officers described the lighting conditions as "good" or "appropriately illuminated," the Commonwealth itself takes as a given that at the time of the shooting, González Ortiz was in a dark area between 30 and 45 feet away from Hewitt, and it is uncontested that the "POLICIA" lettering on González's bulletproof vest was not luminescent.[13] (Docket No. 28, ¶ 41; Docket No. Docket No. 37 at 19, 24; Docket No. 37-1 at 37, 54 n. 7.) No other member of SWAT 3 recognized González Ortiz as a POPR officer prior to the shooting. The fact that SA DeLong and SA Quilinchini, both of whom exited SWAT 3 along with Hewitt, perceived González Ortiz as a threat supports the reasonableness of Hewitt's failure to recognize González Ortiz as an allied officer.

Turning to the assertion that it was unreasonable for Hewitt to use deadly force against González Ortiz, the Commonwealth's arguments are equally unavailing. First, the fact that Hewitt was armed with a machine gun and González Ortiz carried a handgun does not make Hewitt's use of force unreasonable, because after all, one bullet, regardless of whether its source is a machine gun or a handgun, may be enough to end a human life.[14]

---

[13] Generally, in evaluating a motion to dismiss under Federal Rule of Criminal Procedure 12(b), the court views the evidence in the light most favorable to the Commonwealth. See, e.g., Tanella, 374 F.3d at 148. Here, the observations of González Sotomayor, González Ortiz's partner, constitute the most persuasive evidence that Hewitt did not act reasonably in shooting González Ortiz, since González Sotomayor states that a SWAT member shot five or six times at González Ortiz, then after González Ortiz staggered and fell ten feet from the SWAT member, the SWAT member fired five or six more rounds at a range of three to four feet. However, because the Commonwealth itself takes as a given that Hewitt was thirty to forty five feet from González Ortiz at the time of the shooting, and because the Commonwealth does not even reference González Sotomayor's observations for the purposes of argumentation, the court bases its opinion on the facts as affirmatively asserted by the Commonwealth. (See Docket No. 37 at 19-25.)

[14] The PRDOJ report states that the bullets which killed González Ortiz were shot from Hewitt's "H & K" MP-5. (Docket No. 37-1 at 42.) The report does not specify whether this firearm is automatic or not. Nonetheless, in evaluating the pending motion to dismiss, the court assumes that Hewitt was armed with a machine gun.

Second, it was not unreasonable for Hewitt to shoot at González Ortiz before González Ortiz pointed a gun at him, even though Hewitt had the tactical advantage of already pointing his gun at González Ortiz.  The Commonwealth has cited no authority or regulation in support of the proposition that an agent must wait until an armed subject points a gun at him before the agent shoots.  Moreover, even if the gun was not pointed at Hewitt himself, it was Hewitt's responsibility to provide security for the SWAT team as a whole.  Therefore, it was reasonable under the circumstances for Hewitt to use force to address the threat of an unknown, armed subject, who failed to heed instructions to stop moving, before the subject pointed his gun and shot at another, unsuspecting SWAT team member.

Third, even assuming that Hewitt was unable to see González Ortiz's gun, Hewitt reasonably perceived González Ortiz as a threat requiring the use of force.  In at least three other cases, courts have found that Supremacy Clause immunity applied to federal agents who shot and killed unarmed individuals.  In In re Neagle, David Neagle, a United States Deputy Marshall assigned to protect Supreme Court Justice Stephen Field, shot and killed David S. Terry, a publically vociferous and disgruntled litigant, under the mistaken belief that Terry was about to draw a knife on Justice Field. 135 U.S. 1.  The Supreme Court found that Neagle had acted reasonably even though Terry was unarmed, since among other things, Neagle had explicitly been assigned to protect Justice Field against an anticipated attack by Terry, had just observed Terry assault the Justice, had ordered Terry to stop, and had observed Terry reach into his pocket. Id.

In Clifton v. Cox, a DEA agent shot an unarmed fleeing suspect in the back under the mistaken belief that the suspect had shot another agent. 549 F.2d 722.  Agent Clifton was part of a task force executing an arrest warrant for a suspected drug manufacturer who was thought to be

20

armed. Id. at 724, 729.  As Clifton was disembarking the task force helicopter, Clifton "heard noises which sounded like gunshots and he simultaneously observed a fellow officer fall abruptly to the ground." Id. at 729.  Clifton then kicked in the suspect's cabin door, without identifying himself as a law enforcement officer, and the suspect ran out of the cabin towards a nearby wooded area.   Id. at 724.  Clifton twice shouted at the suspect to "halt" and then shot and killed the suspect, who turned out to be unarmed. Id.  The Ninth Circuit affirmed the district court's finding that Clifton had acted reasonably in shooting the suspect because he reasonably believed that the suspect would pose a threat to the lives of the pursuing officers if the suspect was allowed to reach the cover of the woods. Id. at 730.

In New York v. Tanella, DEA agent Jude Tanella was engaged in an operation to arrest a reputed drug dealer and arms trafficker, Egbert Dewgard. 374 F.3d at 142-43.  Dewgard led agents on a high-speed vehicle chase through a residential neighborhood, ramming a detective's car and narrowly missing a pedestrian pushing a three-year-old in a stroller. Id. at 143.  Dewgard then fled on foot, pursued by Tanella and carrying a bag suspected of containing three kilograms of cocaine. Id.  Dewgard disobeyed Tanella's commands to stop, and when Tanella caught up with him, the two physically struggled briefly before Tanella shot Dewgard in close proximity. Id.  The Second Circuit found that Tanella's actions met the objective prong of the "necessary and proper" analysis because he reasonably perceived that Dewgard was about to grab Tanella's gun and because Dewgard's violent efforts in resisting arrest demonstrated his inclination to harm Tanella or others.  Id. at 151-52.

In the instant case, like Neagle, Clifton, and Tanella, Hewitt had reason to believe that the individual he shot posed a risk to himself and his fellow agents.  Hewitt had been warned that the

kidnapping subjects would be armed and dangerous and that there would likely be a 360 degree threat at the scene of the operation.  He heard gunshots and vehicle collisions prior to exiting his vehicle.  He had limited identification information regarding the kidnapping subjects or their vehicles, and there is no evidence that he knew that González Ortiz or any other POPR officer would be in the vicinity.  Hewitt shouted commands which he intended for González Ortiz to hear, and González Ortiz did not comply.  Under these uncertain and dangerous circumstances, Hewitt's perception that González Ortiz presented a threat to himself or other SWAT members, as well as his choice to address that threat by using his weapon, were reasonable as a matter of law.[15]

This conclusion does not mean that González Ortiz's tragic death was unavoidable, but only that Hewitt's mistaken appraisal and measured response were reasonable given the organization of the FBI's operational plan and the unexpected events that transpired at the scene of the arrest operation.  Both Hewitt and González Ortiz were aiming to do their sworn duty as law enforcement officers when González Ortiz was fatally shot.  Because Hewitt did no more than what was "necessary and proper" in the performance of his official duties during the hostage rescue, he is immune from prosecution by the Commonwealth in the instant case.

## IV.   CONCLUSION

For the reasons stated above, it is recommended that Hewitt's motion to dismiss (Docket No. 28) be GRANTED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation.

---

[15]The PRDOJ's own report also concludes, "[t]here is no doubt that . . . the performance of the FBI SWAT team agent [Hewitt] was reasonable within the circumstances surrounding him at that moment." (Docket No. 37-1 at 54.)

Failure to file same within the specified time waives the right to appeal this order. Fed. R. Civ. P. 72(b); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4, 6-7 (1st Cir. 1986).

In San Juan, Puerto Rico, this 1st day of October, 2010.

s/ Marcos E. López
U.S. MAGISTRATE JUDGE